Under what circumstances a copy of a private plot of the land in dispute may be read in evidence

The plaintiff in an action of trespass having had upwards of 20 years possession by enclosures of what was supposed to be lot No. 7, on which the trespass was charged to have been committed, cannot support his action for a trespass committed within the enclosures, if not on lot No. 7

If the sales of certain lots of land were made at public auction, or at private sale, by a plot, the purchasers have a right to hold the lots according to the location which was made on the plot; and evidence cannot be given that the surveyor, when running the lots preparatory to the making out the plot, run the division or other lines different from the lines located on the plot

CARROLL, *et ux.* vs. SMITH.

APPEAL from *Baltimore* County Court. This was an action of trespass *q. c. f.* to recover damages for a trespass on part of a tract of land called *Swan Harbour,* No. 7. The general issue was pleaded, and the lands were located on plots returned under a warrant of resurvey for that purpose.

1. In the trial the plaintiffs, (the appellants,) having proved to the jury that they were legally entitled, in right of *Sophia Carroll,* one of the plaintiffs, to lot No. 7, part of *Swan Harbour,* containing 120 acres, agreeably to the true metes and bounds of said lot, under a deed from *Archibald Buchanan* to *John Pearce,* dated the 12th of April 1785, the defendant, (the appellee,) read in evidence a deed from the said *Buchanan* to *Harry Dorsey Gough,* under whom the plaintiffs claim lot No. 2, part of *Swan Harbour,* dated the 12th of April 1785, for 180 acres of the said land, describing the same by courses and distances. Also a bond of conveyance from the said *Buchanan* to the said *Pearce,* dated the 21st of April 1784, of a lot or piece, of ground, being part of *Swan Harbour* No. 7, described

1815.

Carroll
vs
Smith

by metes and bounds, containing 120 acres. The defendant also, to show the true location of lot No. 7, as originally sold by *Buchanan*, offered to give in evidence a paper purporting to be a plot of *Swan Harbour*, copied from an anonymous plot of said land, and of its division into eight lots, in the possession of *Samuel Vincent*, by *Jehu Bouldin;* and also offered evidence to prove, that the said land called *Swan Harbour*, was sold at public auction in eight different lots, numbered from No. 1 to 8, inclusive, by a plot which was made for that purpose by *James Baker*, except lots No. 1 and No. 7, and that lot No. 3 was sold to *Robert Ballard*, and lot No. 2 to the said *H. D. Gough*, and that lot No. 1 was afterwards sold to the said *Gough*, and lot No. 7 to *John Pearce*; and proved by *Samuel Vincent*, a competent witness, that he was for near 20 years the agent and clerk of the late *H. D. Gough*, under whom the plaintiffs claim, during which time said *Gough*, who had then bought part of the land called *Swan Harbour*, gave to him, with other papers, a plot of *Swan Harbour* laid off into lots, and directed him to take care of said papers, but made no particular mention of said plot, or any other of said papers; that the witness did not know whether it was a correct plot, nor did he ever hear the late Mr. *Gough* say that it was, or say any thing on the subject of it, further than as aforesaid. The defendant also proved by *Jehu Bouldin*, another witness, that he copied said plot in the office of *Vincent*, and made therefrom the paper now offered in evidence, which he proved to be a true copy of the said plot, in the lines, words and figures, on said paper. It was further proved by *James Baker*, a competent witness, that he made the original survey and plot of *Swan Harbour*; that in making the said survey, he cornered lots No. 2, No. 6, and No. 7, at the same place, which place he believes to be the place marked M on the plots returned in this case. That in making the division of the said tract into lots, he began one line at the place marked H on the plots, and ran into Tobacco-House cove, and as he believes to the said place marked M, for the division line between lots No. 2 and lots No. 1, 3, and 7; and that he was a commissioner many years ago on a commission to settle the divisional lines between lots No. 2 and No. 4, on one side, and lots No. 5 and No. 6 on the other, when the said divisional line was so settled as to terminate at the said place marked M, being the place at which he believes that lots No. 2, 6 and 7, originally cornered. And he further proved, that he saw in the possession of *James Carroll*, one of the plaintiffs, the said plot from which *Jehu Bouldin* copied the one now offered in evidence; that it had the general appearance of the plot he had made for said *Buchanan*, but he has no knowledge whether the same was a true copy from his said original plot, or by whom it was made, or whether it was a correct plot of the said lands. It was admitted that the original plot was lost, and that the said plot formerly in possession of the plaintiff *James Carroll*,

was accidentally lost several years ago by certain land commissioners, to whom he had lent it, before the institution of this suit, and who were appointed by *Baltimore* county court to ascertain and settle the true location of .the said lot No. 3, declaring to them that he had no knowledge whatever, and could obtain no information concerning the correctness of the said plot, but was willing to let it be recorded as evidence between the parties of the true location of the lots of *Swan Harbour*, as sold by *Archibald Buchanan*, which however was not done.   The defendant then prayed the cour', that upon the facts given in evidence, the said plot might be offered in evidence to the jury.  To which the plaintiffs objected.   But the Court, [*Nicholson,* Ch. J. and *Bland,* A. J.] overruled the objection, and permitted the plot to be given in evidence to the jury for the purpose aforesaid.   The plaintiffs excepted.

2.  The plaintiffs then offered evidence to prove, that in the year 1785 *John Pearce,* the purchaser and then proprietor of lot No. 7 of *Swan Harbour,* put up a fence from the letter A on the plot, to C, and from C to 49.  And also from A to B, as said lot No. 7 is located by the plaintiffs; and that the plaintiffs, and those under whom they claim, have been in the peaceable possession of said lot as located by them, holding it under enclosures, and claiming it as and for lot No. 7, for 20 years and upwards next preceding the time of bringing the present action; and that the said land, located by them as lot No. 7, has for 20 years, and upwards, next preceding the bringing of said suit, been commonly known and called by the name of lot No. 7.    And the plaintiffs prayed the court to direct the jury, that if they should believe this evidence they, the plaintiffs, were entitled to recover.   Which direction the court refused to give, and the plaintiffs excepted.

3.  The plaintiffs then gave in evidence, that at the sale made at public auction as aforesaid, of parts of *Swan Harbour,* which took place on the 15th of October 1783, the lots No. 1 and No. 7, nor either of them, were sold, and that lot No. 3, which was then sold to *Robert Ballard,* was soon afterwards relinquished by him to the said *Archibald Buchanan,* who afterwards sold it to *James Gittings,* and conveyed it to him by metes and bounds, without any reference whatever in the deed of conveyance to any plot or division, by a deed bearing date on the 24th of December 1784.  And also gave in evidence, that on the 21st of April 1784, the said *Archibald Buchanan,* the proprietor of *Swan Harbour,* sold the said lot No. 7 to *John Pearce,* by a bond of conveyance of that date; and also gave in evidence a deed, dated the 12th of April 1785, whereby the said *Buchanan* conveyed lot No. 1, part of *Swan Harbour,* to *Harry D. Gough,* by metes and bounds.   The defendant offered no evidence to prove that the said lots No. 1. and No. 7, or either of them, were sold

at any time, or to any person, at public sale, or any evidence that they, or either of them, were sold by a plot, other than the circumstance that a plot and division of *Swan Harbour* was made as aforesaid, and that the said plot and division was exhibited at the said public sale to the auctioneer and bidders, and the other circumstance, that in the deed executed by *Buchanan* to *Pearce* for lot No. 7, pursuant to the said bond of conveyance, the said lot is described "as all that part of *Swan Harbour*, known and distinguished on the plot thereof as lot No. 7," and other than the matters before stated; and the defendant offered no evidence, except that before stated, of the existence of the original plot of *Swan Harbour*, nor of the manner in which the lines thereof were run, or in which the said tract was thereon divided into lots, nor of the lines and boundaries of these lots as thereon laid down. The defendant then prayed the opinion of the court, and their direction to the jury, that if the jury believe the sales of lots No. 7, 3 and 1, were made at public auction, or at private sale, by a plot, the purchasers, and those claiming under them, have a right to hold the lots according to the location which was made on the plot by which they were sold; and that the plaintiffs cannot give evidence that the surveyor, when running the lots preparatory to the making out the plot by which the sale was made, run the divisionary or other lines different from the lines located on the plot. Which direction the court gave. The plaintiffs excepted; and the verdict and judgment being against them, they appealed to this court.

The cause was argued before BUCHANAN, EARLE, JOHNSON, and MARTIN, J.

*Harper*, for the Appellants. 1. On the *first* bill of exceptions he contended, that there was no evidence that the plot offered in evidence was a genuine one, and a true copy of that under which the purchase was made. The rule is, that a copy cannot be given in evidence without proof and notice to produce the original.

2. On the *second* bill of exceptions he contended, that the plaintiffs, having had 20 years possession by enclosures, of what was supposed to be lot No. 7, it was sufficient for them to support a trespass committed within the enclosures.

3. On the *third* bill of exceptions he insisted—1. That it was not proper to leave it to the jury to find the lots were sold at private sale by a plot. 2d. And if proper to leave it to the jury, the purchasers were not bound by the plot, if they could show a mistake in the plot. 3d. That there was no evidence of the existence of a plot to which the attention of the jury was to be called; and 4th. That the plaintiffs were not precluded from showing that the surveyor, in making the plot, committed a mistake, and that it was not made pursuant to the running.

1815.

M'Mechen & Sullivan
vs
Maggs

*Martin* for the Appellee, on the *second* bill of exceptions referred to 1 *Esp. Dig.* 310.

THE COURT agreed with the County Court in the opinions expressed in each of the bills of exceptions.

JUDGMENT AFFIRMED.

---

DECEMBER.

## M'MEGHEN & SULLIVAN VS. MAGGS.

*A bill filed in chancery by J M stating, that being the owner of a certain number of shares of stock in a bank, on the marriage of her daughter to J L, and with a view to advance him by making him appear to be the owner of those shares, she caused them to be transferred to him in 1805, under a private agreement that she should have the dividends during her life, and if she died before her daughter that the stock was to belong to her daughter, subject to her sole and absolute use and disposal. In 1806 J L, about to purchase a house, and lot solicited J M, to which she consented, that the stock should be sold, to raise money to aid him in paying for the property, he promising to convey it to secure to her and his wife the money the stock should bring, thereby to change her right to the stock into a lien upon the property to an equal amount. The stock was sold, and J L received and applied the proceeds in part payment of the property; and having paid the whole purchase money, received a conveyance therefor in August 1806 J L, though applied to for that purpose. refused to perform his promise, and after the death of his wife, positively refused either to pay the amount of the money produced by the stock, or to give a conveyance on the house and lot—Decreed, that J L should pay to J M the sum of money received for the stock, with interest, &c. and if not paid by, &c. the property should be sold, &c. The money not being paid, the property was sold in April 1811, and the sale ratified. Before the sale and ratification, M & S petitioned the chancellor, stating that at the solicitation of J L they had in 1807, 1808 and 1809, endorsed for him sundry promissory notes, under an agreement that if they were not regularly taken up by J L, he would give to them a mortgage on the above mentioned house and lot. That M & S were compelled to take up the notes, and J L in July 1809, executed to them a mortgage of the property, according to the engagement above mentioned. When M & S endorsed the notes for J L, they had no knowledge that any person had any claim, either legal or equitable, on the house and lot. In February 1810, J L gave an absolute deed to M & S for the property. When the mortgage and deed were executed, M and S are supposed to have had knowledge of the lien of J M. J M before filing her bill against J L, brought suit against him at law, and in March 1809 obtained a judgment for the amount of her claim for the stock. M & S, by their petition, prayed a suspension of the sale, &c. The sale was not suspended, but the chancellor intimated that the sale, when made, would be subject to the ratification of this court, and M & S would then be heard, &c. Afterwards he decreed, that the petition be dismissed—which on appeal was affirmed*

APPEAL from the Court of Chancery. On the 22d of March 1809, *J. Maggs*, (now appellee,) filed her bill against one *J. F. Levy*, stating, that holding 13 shares of stock in the *Union Bank of Maryland*, and one share in the *Bank of Baltimore*, on the marriage of her daughter *Ann* to *Levy*, and with a view to advance him by making him appear to be the owner of those shares, she caused them to be transferred to him in the year 1805, under a private agreement that she should have the dividends accruing thereon during her life, and upon her death before her said daughter, the said stock was to belong to her said daughter, subject to her sole and absolute use and disposal. That in July 1806, *Levy* being desirous to purchase from one *J. Fowble* a house and lot in *Eutaw street*, in the city of *Baltimore*, the complainant was solicited to give her consent, and she did give her consent, that the stock in the *Union Bank* should be sold to raise money to aid him in paying for the house and lot, he positively promising the complainant to convey and make over the house and lot, to secure to the complainant, and his wife, the money which the stock should bring; thereby agreeing to change the rights of the complainant to the stock, and the dividends thereof, as above set forth, into a lien upon the house and lot to an equal amount, the interest thereon to be paid yearly. That the stock was sold on the 21st of August following, and produced the sum of $1384 50, which *Levy* received, and applied in part payment for the house and lot; and he having fully paid for the same, received a conveyance therefor from *Fowble* on the 22d of August 1806. That *Levy*, although applied to, &c. refused to perform his said promise, &c. And since the death of the said *Ann*, which happen-